IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WM. C. PLOUFFE, JR., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 10-1502 |
| | : | |
| v. | : | |
| | : | |
| F. JAVIER CEVALLOS, ANNE ZAYAITZ, | : | |
| SHARON PICUS, ALEXANDER | : | |
| PISCIOTTA, DEBORAH SEIGER, | : | |
| PIETRO TOGGIA, MARK RENZEMA, | : | |
| MAHFUZUL KHONDAKER, JONATHAN | : | |
| KREMSER, KEITH LOGAN, GARY | : | |
| CORDNER, ANN MARIE CORDNER, | : | |
| ROBERT WATROUS, JOHN | : | |
| CAVANAUGH, MICHAEL MOTTOLA, | : | |
| JOHN DOES, employees, officers, | : | |
| supervisors, and/or policy makers of | : | |
| Kutztown University and/or Pennsylvania | : | |
| State System of Higher Education (PASSHE), | : | |
| in their official and individual capacities, and | : | |
| KUTZTOWN UNIVERSITY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                          April 27, 2016

The *pro se* plaintiff, William C. Plouffe, Jr. ("Plouffe"), initially filed this action in 2010 against, among others, his former employer, Kutztown University, seeking redress in connection with his termination as a tenure-track professor in the Department of Criminal Justice. Although the orderly progression of this matter has not been without interruption, the time is now ripe for determining whether Plouffe is entitled to present any of his claims to a jury. If he had his way, the court would empanel a jury to pass upon the actions of the defendants as measured against not only federal and state statutes, but also against the federal Constitution. The defendants argue that Plouffe is not entitled to present any of his claims to a jury because a reasonable jury

could not find in his favor on any of them. Filtering the current record through familiar summary judgment principles, the court concludes that Plouffe is entitled to stand before a jury. The jury, however, will not be asked to consider claims of a constitutional magnitude. At its core, and despite the current state of the docket, this action smacks of a relatively straightforward employment case. As such, only claims of a statutory origin will be in play. In what follows, the court explains this disposition. The court also addresses two procedural issues that have a marked tendency to crop up in *pro se* cases.

## I.    PROCEDURAL HISTORY

This case is over six years old.[1] The filings are numerous. Plouffe has filed multiple interlocutory appeals. Motion practice has been quite involved. For the sake of clarity and simplicity, the court recounts only those procedural events that add color to the legal issues that require disposition.

Plouffe commenced this action on April 5, 2010, by filing a complaint against many of the currently-named defendants. *See* Compl., Doc. No. 1. After extensive motion practice and various amended complaints, he filed the operative fifth amended complaint on March 25, 2013, against all of the currently-named defendants. *See* Fifth Am. Compl., Doc. No. 200.[2] Over a year later, and after a significant period of time in which Judge McLaughlin stayed this case to assist Plouffe both in maintaining this litigation in the face of serious health issues and in

---

[1] Due to a procedural twist, there is a companion case pending before the undersigned. *See Plouffe v. Gambone, et al.*, No. 11-6390. Although that action deals with different defendants, its factual backdrop largely mirrors that of this case. Adding another parallel, the defendants there have also moved for summary judgment on all claims. While the court draws from the reasoning contained in this opinion to dispose of that motion, the court formally addresses the motion in a separate opinion.
[2] During this time, the Honorable Mary A. McLaughlin presided over this matter.

attempting to secure counsel, Brian Puricelli, Esq. ("Puricelli") entered his appearance on behalf of Plouffe on April 11, 2014. *See* Appearance, Doc. No. 232.[3]

As discovery came to a close, Puricelli filed his first motion to withdraw as counsel on June 29, 2015. *See* Mot., Doc. No. 245. In support of this motion, Puricelli stated that "there is an irreconcilable difference between counsel and client, a loss of communication and cooperation with the client exists, which counsel has unsuccessfully attempted to foster, and the representation is placing a financial burden on counsel." *Id.* at 1. Before Judge McLaughlin had a chance to address the motion to withdraw, all of the defendants collectively filed a motion for summary judgment on July 1, 2015. *See* Mot. for Summ. J., Doc. No. 247. After a telephone conference on July 9, 2015, Judge McLaughlin entered an order in which she indicated that Puricelli had agreed to continue to represent Plouffe throughout the summary judgment stage. *See* Order, Doc. No. 250. The order also provided that Plouffe should file a response to the outstanding motion for summary judgment by August 15, 2015. *See id.* Before that date could pass, Puricelli filed a renewed motion to withdraw, again claiming that the attorney-client relationship had completely broken down. *See* Renewed Mot., Doc. No. 257. On August 17, 2015, the Honorable Petrese B. Tucker reassigned this matter to the undersigned. *See* Order, Doc. No. 259.

After holding a hearing on the renewed motion to withdraw, the court allowed Puricelli to withdraw on October 8, 2015. *See* Order, Doc. No. 271. At that time, the court also rereferred this matter to the Plaintiffs' Employment Panel, consolidated this case with the previously mentioned companion case for purposes of trial, and extended the time for Plouffe to file a response to the motion for summary judgment. *See id.* Plouffe filed his response, with

---

[3] It appears that Judge McLaughlin appointed Puricelli from the Plaintiffs' Employment Panel. *See* Order, Doc. No. 231.

accompanying exhibits, on October 29, 2015. *See* Resp., Doc. No. 289. The court heard

argument on the motion for summary judgment on December 18, 2015. On January 6, 2016, the

court entered an order staying this matter for thirty days to provide Plouffe with another

opportunity to obtain counsel. *See* Order, Doc. No. 368. Unfortunately, no attorney has entered

an appearance on his behalf. The court has scheduled a final pretrial conference for June 1,

2016. *See* Order, Doc. No. 383.

## II.     FACTUAL BACKGROUND

Giving Plouffe, as the non-moving party, the benefit of all evidentiary doubts, the court

adopts his version of the facts as the operative record.[4] Kutztown University hired Plouffe to

serve as a "tenure-track Assistant Professor in the Department of Criminal Justice" beginning in

January 2008. Plouffe's Statement at ¶ 1, Doc. No. 290. The parties entered into a "contract of

employment which was renewable annually." *Id.* at ¶ 2. To aid in giving some structure to the

more substantive statements of fact, the court takes guidance from the following passage:

> Over the course of his two years of employment at the University, Plouffe
> experienced multiple conflicts with other members of the Department and the
> University, particularly the Department chair, defendant Alexander Pisciotta
> [("Pisciotta")], and another professor, defendant Keith Logan [("Logan")]. These
> conflicts erupted over a variety of topics, including publication authorship,
> teaching course load and course assignments, a proposed Master's degree
> program, examination writing, a speaker series, and a Westlaw subscription.

*Plouffe v. Cevallos*, No. CIV.A. 10-1502, 2012 WL 1994785, at *1 (E.D. Pa. June 1, 2012)

(McLaughlin, J.).

---

[4] That version is taken from Plouffe's Statement of Undisputed Facts. *See* Plouffe's Statement, Doc. No. 290. In support of many of the statements appearing in that document, Plouffe filed his own affidavit. *See* Plouffe's Aff., Doc. No. 291-1. "[A] plaintiff's affidavit can be competent evidence to rebut a motion for summary judgment." *Murry v. Barnes*, 122 F. App'x 853, 855 (7th Cir. 2004) (citation omitted). The defendants have neither attacked the evidentiary quality of Plouffe's affidavit nor argued that any of the specific statements appearing in Plouffe's Statement of Undisputed Facts are unsupported by record evidence.

For example, Plouffe received permission "to teach an overload course" as a way of making more money. Plouffe's Statement at ¶ 3. Pisciotta, however, subsequently "removed the overload course from Plouffe and gave it to Logan." *Id.* at ¶ 4. After grieving the matter, Plouffe got the course back. *See id.* As another example, "Pisciotta told Plouffe to start developing a Law of Terrorism class." *Id.* at ¶ 5. After preparing materials for the class, Logan asked Plouffe to see those materials, to which Plouffe obliged. *See id.* Plouffe later discovered that "Logan had plagarised [sic] Plouffe's materials and Pisciotta had given the course to Logan, without telling Plouffe." *Id.* After Plouffe had gone to "the Union for assistance," "Pisciotta apologized to Plouffe but would still not return the course." *Id.* As a final example, "several students came to Plouffe and reported that Logan was uncollegially defaming Plouffe, telling the students not to take Plouffe's classes because [he] did not know what he was doing." *Id.* at ¶ 6. Plouffe's complaints surrounding this incident went unanswered. *See id.* At some point, Plouffe sought out "fellow Union members in the Criminal Justice Department for advice and help." *Id.* at ¶ 8.

In October 2008, "Plouffe received his first year review from the Performance, Evaluation, and Tenure Committee consisting of Toggia, Renzema, and Seiger [fellow professors in the Criminal Justice Department]." *Id.* at ¶ 10. Although Plouffe received a satisfactory rating, which indicates the highest level of performance, his review "included comments about some minor issues involving disputes, which should not have been included in [the] evaluation." *Id.* at ¶ 12; *see id.* at ¶ 11. "On October 24, 2008, Pisciotta, the Criminal Justice Department Chair, completed his review of Plouffe." *Id.* at ¶ 16. In similar fashion, Plouffe received a "Very Good" rating, though again there were some comments concerning communication issues. *See id.* at ¶ 17. Despite the presence of these comments, "they were the best evaluations for a

first year faculty member in the recent history of Kutztown University." *Id.* at ¶ 19. Taking the Union's advice, Plouffe filed a "contractually allowed rebuttal" to the comments that he deemed improper. *Id.* at ¶ 21. Pisciotta filed a retaliatory reply to Plouffe's rebuttal, though the reply was ultimately stricken from Plouffe's personnel file. *See id.* at ¶¶ 23-25. "Plouffe was renewed for a second year of employment by Kutztown University from January 2009 to January 2010." *Id.* at ¶ 27.

Plouffe's major conflict with Kutztown University materialized in the spring of 2009. During that time, Plouffe was appointed to a "Search Committee with Khondaker and Toggia [professors in the Criminal Justice Department] to find a temporary (one year) professor for the [Department]." *Id.* at ¶ 33. "Kutztown policy mandated that a person who did not have the advertised qualifications was not eligible for hire and was not even eligible for an interview." *Id.* at ¶ 35. "Plouffe was told by Toggia and Pisciotta that there was a favored candidate who was going to be hired: Michael Pittaro [("Pittaro")]." *Id.* at ¶ 38. After reviewing Pittaro's credentials, Plouffe discovered both that he did not possess the "advertised qualifications" and that he lied about his academic accomplishments. *Id.* at ¶ 40. Plouffe subsequently brought these issues, in addition to conflict-of-interest issues, to the attention of the Search Committee and the Criminal Justice Department. *See id.* at ¶¶ 42-44. He indicated that the hiring of Pittaro would violate both criminal law and ethical codes. *See id.* at ¶¶ 50-51.

The members of the Criminal Justice Department responded to Plouffe by becoming verbally abusive towards him and stating that "they were still going to interview and hire Pittaro which they subsequently attempted." *Id.* at ¶ 47; *see id.* at ¶ 45. The Search Committee ended up interviewing Pittaro. *See id.* at ¶ 49. In the face of Plouffe's continuing objections, it appeared that Pittaro was ultimately going to be recommended for hire. *See id.* at ¶¶ 57-58.

After putting everyone on notice that he would report this "illegal and unethical activity" "up the chain of command," Plouffe eventually filed a "whistle blowing complaint" with the University Dean, Provost, and the Office of Social Equity. *Id.* at ¶¶ 59, 61. "The Office of Social Equity upheld Plouffe's complaint" and "advised the Criminal Justice Department that Pittaro was not qualified and would not be hired." *Id.* at ¶ 62.

In the wake of his "successful whistle blowing," Plouffe's relations with the other members of the Criminal Justice Department soured. *See id.* at ¶ 63. "In the late [s]pring of 2009, Plouffe was told by the Union and several other professors that the Criminal Justice Department was going to fire him for his whistle blowing." *Id.* at ¶ 72. Around the same time, the Criminal Justice Department filed a complaint with the University Dean "raising over 140 complaints against Plouffe covering the time since his employment in 2008." *Id.* at ¶ 77. Without sufficient notice, the Dean interrogated Plouffe on July 17, 2009, regarding the complaint filed by the Criminal Justice Department. *See id.* at ¶¶ 81-82. The Dean refused Plouffe's request to have union representation present during the meeting. *See id.* Perhaps having some connection with the topics discussed at the July 17 meeting, the Human Relations Department commenced an investigation into "a complaint by the Criminal Justice Department of a hostile work environment created by Plouffe." *Id.* at ¶ 85. On September 3, 2009, Plouffe was once again interrogated (though this time with union representation) without being provided with a sufficient opportunity to present his side of the story. *See id.* at ¶ 89. All the while, Plouffe was receiving disparate treatment within the Criminal Justice Department itself. *See id.* at ¶¶ 79, 83-84, 88.

On October 6, 2009, "Plouffe was scheduled for a Pre-Disciplinary Conference with Cevallos [the University President]." *Id.* at ¶ 91. Prior to the conference, Plouffe and his union

representatives had been unsuccessful in obtaining the specifics about what was to occur. *See id.* at ¶ 92. At the time of the conference, Plouffe asked for a continuance so that he could prepare an adequate defense. *See id.* at ¶ 94. That request was denied. *See id.* Towards the end of the conference, Cevallos "allowed Plouffe to say a few sentences about each of the general charges." *Id.* at ¶ 95. "At the end of the Conference, Plouffe asked to be allowed to submit a brief, which Cevallos took under advisement." *Id.* at ¶ 96. "[W]ithout being given the chance to file a brief," "Plouffe was given his termination letter as he exited his classroom" on October 7, 2009.[5] *Id.* at ¶ 98. The reasons given for his termination were: "1) failure to develop constructive relationships and 2) contributing to significant conflicts preventing the Criminal Justice Department from functioning." *Id.* at ¶ 99. "Before Plouffe was terminated," he was told "that the Criminal Justice Department had already selected the person to replace him and that his termination had been already been [sic] decided and that the Pre-Disciplinary Conference was a mere formality." *Id.* at ¶ 113.

Prior to Plouffe, nobody had ever been "disciplined or terminated for such reasons at Kutztown University." *Id.* at ¶ 103. His termination "violated the basic policy that discipline was to be corrective and progressive." *Id.* at ¶ 104. Viewing the termination with an eye towards some form of discrimination, "the Local Union . . . advised Plouffe that a number of female professors who had been much more uncollegial than Plouffe had not been terminated or disciplined." *Id.* at ¶ 109. On one occasion, Plouffe observed a female professor publicly berate a male professor in front of students. *See id.* at ¶ 110. The female professor was never disciplined. *See id.* Moreover, Plouffe was made aware of a female professor in the Sociology Department who lashed out against her colleagues in a violent manner. *See id.* at ¶ 111. This

---

[5] Although Plouffe has the date as "Friday, October 7, 2009," October 7, 2009, was actually a Wednesday. Plouffe's Statement at ¶ 98. Plouffe's termination letter, which is marked as "Hand Delivered," is dated October 9, 2009, which was a Friday. Ex. 33, Doc. No. 291-2.

professor was never disciplined and, in fact, was granted tenure. *See id.* Although not explicitly stated in Plouffe's Statement of Undisputed Facts, it appears that Plouffe was replaced by a female professor, Janie Slamon. *See* Plouffe's Aff. at ¶ 81. To top it off, Kutztown University also failed to post "the Pennsylvania Whistle Blower Act." Plouffe's Statement at ¶ 106.

"After Plouffe was terminated, he made more than 300 applications for employment, most at academic institutions." *Id.* at ¶ 121. He never received a job, seemingly, at least in part, due to knowledge of his whistle blowing activities. *See id.* Back at Kutztown University, both "Toggia and Logan gave statements" to the school newspaper regarding his termination. *Id.* at ¶ 135. In addition, his "ratemyprofessor.com ratings" (which apparently had been quite good) disappeared, although "other professors who were no longer at the Criminal Justice Department at Kutztown University still had their ratings on the website." *Id.* at ¶ 136. At some point, Pisciotta told Plouffe's former students that "'Plouffe would never work at Kutztown University again.'" *Id.* at ¶ 7C.

### III.    DISCUSSION[6]

### A.    <u>Preliminary Procedural Issues</u>

Before getting to the heart of the matter, the court must address two procedural concerns that are of great importance to Plouffe. The first concern centers on his frustration with what he believes to be an obstructionist effort on the part of the court to prevent him from obtaining counsel. Suffice it to say, no such effort exists. Indeed, the court would heartily welcome counsel to enter an appearance on behalf of Plouffe. The fundamental legal problem, though, is that, unlike private litigants, who are relatively unconstrained in using their own resources as they see fit to hire a lawyer, the court is operating within the bounds of a statutory, and possible

---

[6] The court has subject-matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state claims pursuant to 28 U.S.C. § 1367.

constitutional, constraint. 28 U.S.C. § 1915(e)(1) provides that "[t]he court may *request* an attorney to represent any person unable to afford counsel." (emphasis added). "[C]ourts have no authority under the *in forma pauperis* statute, 28 U.S.C. § 1915(e)(1), to compel counsel to represent an indigent civil litigant; the court may only make the request." *Williams v. Forte*, 541 F. App'x 193, 196 (3d Cir. 2013) (emphasis in original) (citation omitted). The court, in other words, must rely on the good graces of counsel.

In this case, both Judge McLaughlin and the undersigned have made the request by referring this matter to the Plaintiffs' Employment Panel. Beyond that, both Judge McLaughlin and the undersigned have stayed this case at various points for the sole purpose of providing Plouffe with an opportunity to make a request on his own. *See* Orders, Doc. Nos. 226, 368. And, let it not be forgotten, Plouffe did, in fact, have counsel—as always, the good graces of the bar were forthcoming. Of course, and unfortunately for Plouffe, that representation did not work out. With the permission of the court, Puricelli formally withdrew his services from a tortured attorney-client relationship on October 19, 2015. *See* Withdrawal of Appearance, Doc. No. 276. Despite ample opportunity, no attorney has agreed to take on this matter on the second go-round. Although a hard reality, it is not uncommon; "[m]ost indigent parties in civil cases must fend for themselves." *DiAngelo v. Illinois Dep't of Pub. Aid*, 891 F.2d 1260, 1262 (7th Cir. 1989) (Easterbrook, J.).

But this does not mean that the litigation must come to a screeching halt. Circumstances dictate that it must continue, for all litigation must end. Both the court and the parties have an obligation "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. To reiterate, this rather routine employment case is now over six years old. Plouffe has ably demonstrated that he possesses the mental capacity to defend himself

in this case. To be sure, he just single-handedly staved off summary judgment on some of his claims. The court has scheduled a jury trial to begin in Allentown, Pennsylvania (so that Plouffe does not have to travel the further distance to Easton, Pennsylvania) on June 7, 2016. *See* Order, Doc. No. 383. Prior to trial, and most likely at the final pretrial conference, the court will entertain any requests that Plouffe might wish to present, other than postponing the trial for the purposes of continuing his efforts to obtain counsel, that touch on what physical accommodations he may need to enable him to present his case to a jury. Barring extraordinary circumstances, this case will, as justice mandates that it must, be concluded by the end of June. All parties deserve the solace of finality.

The second procedural issue concerns Plouffe's repeated requests to have the undersigned recuse himself from presiding over this matter. The current request takes the form of a running list (now up to twenty-four violations) of all of the times the undersigned has allegedly violated the Canons of Judicial Conduct. *See* Second Am. to Mot. to Recuse, Doc. No. 378. The alleged violations range from improperly (in Plouffe's eyes) applying the law to frustrating (again in his eyes) his attempts to retain counsel. *See id.* at 4-5, 14, 21, 33-34.

In general, while "a party may seek to recuse a federal judge on the basis of bias or prejudice" under 28 U.S.C. § 144, 28 U.S.C. § 455 "requires a judge to recuse where his or her impartiality might reasonably be questioned." *Petrossian v. Cole*, 613 F. App'x 109, 112 (3d Cir. 2015) (citation omitted). Under either statute, "a party's displeasure with legal rulings does not form an adequate basis for recusal." *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 278 (3d Cir. 2000) (citations omitted). Further, "recusal is not required on the grounds of unsupported, irrational, or highly tenuous speculation." *In re Kokinda*, 581 F. App'x 160, 161 (3d Cir. 2014) (internal quotation marks and citation omitted).

As should be apparent, Plouffe's running list of alleged violations adds up to nothing more than a manifestation of his displeasure with the undersigned's rulings. "Judges have an obligation to litigants and their colleagues not to remove themselves needlessly." *Matter of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 839 F.2d 1226, 1229 (7th Cir. 1988) (Easterbrook, J.) (citation omitted). To recuse in this matter, where the record reveals absolutely no basis for it, would be to abdicate this high duty. The court will not allow that to happen. The court denies any requests to recuse and, accordingly, turns to the merits of the motion for summary judgment.

**B.    Standard – Motion for Summary Judgment**

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met

this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c)(1) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (internal quotation marks and citation omitted). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing

summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007) (citation omitted). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

## C.     Analysis

### 1.     The First Amendment Claims

The defendants first move for summary judgment on Plouffe's First Amendment claims, which are broken down into a claim under the Speech Clause and a claim under the Petition Clause. *See* Mot. for Summ. J. at 11-16, Doc. No. 247. Because "[t]he considerations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause," courts have applied the same type of analysis to both types of claims. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 389 (2011); *see Devlin v. Kalm*, 630 F. App'x 534, 540 (6th Cir. 2015) (stating that "[w]hether this retaliation claim is brought under the Free Speech Clause or the Petition Clause of the First Amendment, we apply the same analysis" (citation omitted)); *Fields v. City of Tulsa*, 753 F.3d 1000, 1013 n.1 (10th Cir. 2014) (reading *Guarnieri* for the proposition that "retaliation claims by public employees are subject to the same test regardless of whether they are under the Free Speech or Petition clauses of the First Amendment"); *Kimmett v. Corbett*, 554 F. App'x 106, 110 n.5 (3d Cir. 2014) (noting that "[t]he standards applicable to each type of protected conduct are similar"

(citation omitted)).  This court likewise discusses both claims under the same analytical framework.[7]

The parties seem to agree on the core workings of that framework, but they disagree over its contours.

> To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred.

*Dougherty v. School Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014) (citation omitted). The critical question here is whether Plouffe engaged in activity protected by the First Amendment, which is "a question of law." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (internal quotation marks and citation omitted).  If the court determines that Plouffe did not engage in activity protected by the First Amendment as a matter of law, the court "need not address the other aspects of the First Amendment retaliation inquiry." *Burne v. Siderowicz*, 445 F. App'x 529, 533 (3d Cir. 2011).

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (internal quotation marks and citation omitted).  "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (internal quotation marks and citation omitted).  "[W]hen public employees

---

[7] To the extent that Plouffe makes some form of argument that the court is prohibited from considering the import of *Guarnieri* based on Federal Rule of Civil Procedure 59, that argument is misplaced as that Rule is not operative at this time.  *See* Resp. at 4, Doc. No. 289.  Moreover, "a decision on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery." *Devlin*, 630 F. App'x at 539 (internal quotation marks and citation omitted).

make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. The court begins (and ends) with a discussion of the first prong because "[i]f an employee's speech was made pursuant to his official duties, [the court] need not examine whether [the] speech passes the [second and third steps]." *Kimmett v. Corbett*, 554 F. App'x 106, 111 n.9 (3d Cir. 2014) (alteration added and in original) (internal quotation marks and citation omitted).

Both the Supreme Court and the Third Circuit "have forgone any attempt to create a comprehensive framework for determining whether speech is made pursuant to an employee's official job duties." *Flora v. County of Luzerne*, 776 F.3d 169, 177 (3d Cir. 2015) (citation omitted). Because "[t]he proper inquiry is a practical one," the Third Circuit "has given contours to *Garcetti*'s practical inquiry for defining the scope of an employee's duties." *Garcetti*, 547 U.S. at 424; *Dougherty v. School Dist. of Philadelphia*, 772 F.3d 979, 988 (3d Cir. 2014). The court must examine:

> among other things: (1) whether the employee's speech relates to special knowledge or experience acquired through his job . . . ; (2) whether the employee raises complaints or concerns about issues relating to his job duties up the chain of command at his workplace . . . ; (3) whether the speech fell within the employee's designated responsibilities . . . ; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them.

*Kimmett*, 554 F. App'x at 111 (internal quotation marks, citations, and footnote omitted). The touchstone appears to be determining whether the employee's speech in question was or "was not part of the work he was paid to perform on an ordinary basis." *Flora*, 776 F.3d at 180 (citation omitted).

Given the way in which the parties frame the issue, the court need only consider whether Plouffe was speaking as a citizen when he complained of the potential hiring of Pittaro. While it is true that the First Amendment protects some speech "made at work" and "related to the speaker's job," this is not one of those instances. *Garcetti*, 547 U.S. at 420-21 (citations omitted). "Whether a person speaks as a citizen depends less on the subject matter—though that is relevant—than on the manner of speech, specifically whether the plaintiff is expected, pursuant to [his or her] job duties, to make the speech that is at issue." *Jerri v. Harran*, 625 F. App'x 574, 580 (3d Cir. 2015) (internal quotation marks and citation omitted).

Here, when Plouffe became part of the Search Committee, he assumed responsibilities that came along with that role. Working closely with the Committee, he found out that some of his colleagues were going to make a recommendation that contravened, among other policies, established Kutztown policy. It does not seem unreasonable to expect that an employee in Plouffe's situation would act as he did to protect the integrity of the hiring process. And perhaps more importantly, he used a procedure established by Kutztown University to bring his concerns to the attention of the University Administration. "[A]s a general matter, expressing concern about an employer's actions up the chain of command . . . is unlikely to be protected." *Id.* at 581 (internal quotation marks and citations omitted); *see Kimmett*, 554 F. App'x at 112 (stating that "[b]ecause this speech was made up the chain of command and related to his employment duties, it was pursuant to his job duties" (citation omitted)); *Taylor v. Pawlowski*, 551 F. App'x 31, 32 (3d Cir. 2013) (stating that "[w]e have held that [i]n making their voices heard up the chain of command, government employees speak pursuant to their duties as government employees" (internal quotation marks and citation omitted)).

True, Plouffe may not have had a legal or contractual obligation to report his concerns. But this misses the point. The inquiry is a practical one. The important point is that once Plouffe was appointed to the Search Committee, he took on a professional role beyond the strict confines of the classroom—indeed, many professors assume duties that take them beyond teaching classes, grading exams, and engaging in scholarly activities. It seems quite sensible to conclude that, as a professor tasked with the duty to assist in a collaborative effort to recommend a hire, Plouffe was employed, at least in part and at least at that time, with the expectation that he would use internal grievance procedures (should it come to that) to ensure that that collaborative effort fulfilled its stated purpose. This is enough to take his activity outside the ambit of the First Amendment.

Because Plouffe did not speak as a citizen when he filed his petition regarding Pittaro's hiring, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983) (citation omitted). Consequently, the court grants the defendants' motion with respect to the First Amendment claims and enters judgment in their favor.[8]

## 2. The Due Process Claim

The defendants next move for summary judgment on Plouffe's due process claim. *See* Mot. for Summ. J. at 16-18. This claim too can be broken down into two parts for Plouffe asserts that the defendants violated both a property and a liberty interest. *See* Resp. at 14-24. The court takes each in turn.

---

[8] To the extent that Plouffe seeks damages from the individual defendants in their individual capacities, the court notes for the sake of completeness that those defendants would likely be protected by qualified immunity. To the extent that he seeks prospective relief under an *Ex Parte Young* theory, the court notes the possibility of justiciability issues given his current state of health.

At the outset, Plouffe is correct in recognizing that Judge McLaughlin did not prohibit him from pressing a due process claim based on a property interest past the pleading stage. *See id.* at 14; *see also* Order, Doc. No. 97. But, as much as he argues otherwise, the court is also not prohibited from considering the merits of this claim at this time, especially when the defendants have affirmatively requested its dismissal. Even though they address different legal aspects of this claim, "[f]ederal courts are entitled to apply the right body of law, whether the parties name it or not." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001) (Easterbrook, J.) (citations omitted). The court thus takes a fresh look at this claim.

"A procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute due process of law." *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) (internal quotation marks and citation omitted). Plouffe's claim fails on the first prong, so the court need not discuss the second one.

"Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Baraka v. McGreevey*, 481 F.3d 187, 205 (3d Cir. 2007) (internal quotation marks and citation omitted). Although "a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment," "the Supreme Court has never held that every state contract gives rise to a property interest." *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991) (citations omitted). The Third Circuit has "recognized only two general types of contracts that create . . . property interests: one type is a contract characterized by the quality of either the extreme dependence, or permanence and sometimes both; the other type is where the

contract contains a provision that the state entity can terminate the contract only for cause." *Pence v. Mayor & Twp. Comm. of Bernards Twp.*, 453 F. App'x 164, 167-68 (3d Cir. 2011) (citation omitted). "An employment contract by itself is not sufficient." *Chinoy v. Pennsylvania State Univ.*, No. 11-CV-01263, 2012 WL 727965, at *3 (M.D. Pa. Mar. 6, 2012) (citation omitted).

In this case, Plouffe grounds his property interest claim in the fact that he had an unexpired employment contract at the time of his termination. *See* Resp. at 14. Standing alone, this is insufficient to create a protectable property interest. There is simply no indication that either this contract or the governing Collective Bargaining Agreement had a "for cause" provision for non-tenured faculty. Accordingly, Plouffe, as a probationary tenure-track professor, cannot claim a property interest in continued employment.

Turning to the liberty interest claim, "to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008) (emphasis in original) (internal quotation marks and citations omitted). "Courts within the Third Circuit have consistently found that no liberty interest of constitutional significance is implicated when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance." *Carroll v. Lackawanna Cty.*, No. 3:12-CV-2308, 2015 WL 5512703, at *9 (M.D. Pa. Sept. 16, 2015) (internal quotation marks and citations omitted). Further, "[i]n all of the cases discussing the stigma-plus test, a basic fact pattern exists. An employer creates and/or disseminates a false and defamatory impression about the plaintiff in connection with the plaintiff's termination. The employers' actions have come first and the

employees' terminations have followed either immediately or shortly thereafter." *Paterno v. Pennsylvania State Univ.*, No. CV 14-4365, 2016 WL 758305, at *10 (E.D. Pa. Feb. 25, 2016).

Here, these principles operate such that a reasonable jury could not award Plouffe relief for a violation of his liberty interest. Many of the statements that Plouffe relies on to satisfy the stigma prong either were made after he was terminated or "were not sufficiently stigmatizing to implicate a liberty interest." *Brown v. Montgomery Cty.*, 470 F. App'x 87, 91 (3d Cir. 2012) (citation omitted). To the extent that he relies on the dissemination of the fact that he complained about Pittaro's hiring, it is hard to see how this information is "substantially and materially false." *Id.* (citation omitted). After all, that is exactly what happened.

Consequently, and regardless of how this particular claim is framed, the court grants the defendants' motion with respect to the due process claim and enters judgment in their favor.[9]

### 3. The Whistleblower Claim Under the Pennsylvania Whistleblower Law

Switching gears to address a claim under state law, the defendants ask the court to enter judgment in their favor on Plouffe's whistleblower claim pursuant to the Pennsylvania Whistleblower Law ("Whistleblower Law"), 43 Pa. Stat. Ann. §§ 1421-1428. *See* Mot. for Summ. J. at 18-21. As a preliminary matter, it appears that the state legislature amended certain provisions of the Whistleblower Law in 2014. The parties do not directly discuss this issue, even though it appears that the legislature amended provisions relevant to this case. In a similar vein, the court does not grapple with the intricacies of the retroactivity issue (which would appear to turn on questions of state law) because the defendants' arguments fail on their own terms.

---

[9] With respect to Plouffe's other arguments, the court simply observes that "a unit of state or local government does not violate the federal Constitution just because it violates a state or local law, including the law of contracts." *Garcia v. Kankakee Cty. Hous. Auth.*, 279 F.3d 532, 535 (7th Cir. 2002) (Easterbrook, J.) (citation omitted). And for good measure, "the procedural protections available . . . under the CBA do not create a property right." *Gooden v. Pennsylvania*, No. CIV.A.10-3792, 2010 WL 5158996, at *7 (E.D. Pa. Dec. 10, 2010).

Presuming, as the defendants do,[10] that the prior version of the statute is controlling, the defendants' three-part argument does not do the work assigned to it. First, they argue that certain individual defendants cannot be held liable under the Whistleblower Law because they did not supervise Plouffe. *See id.* at 20. For that proposition, the defendants purportedly turn to the fact that, under the prior version of the statute, "an employer *is a person supervising one or more employees*, including the employee in question; a superior of that supervisor; or an agent of a public body." *Rankin v. City of Philadelphia*, 963 F. Supp. 463, 468 (E.D. Pa. 1997) (emphasis added) (internal quotation marks and citation omitted). But they do not at all address the "agent of a public body" language. This might not be fatal when viewed in isolation, but courts have held that, contrary to the defendants' position, co-workers can be "employers" under the Whistleblower Law. *See id.* (holding that two co-workers were "agents of a public body and therefore employers under the Whistleblower Law" (internal quotation marks omitted)); *see also Boyer v. City of Philadelphia*, No. CV 13-6495, 2015 WL 9260007, at *8 (E.D. Pa. Dec. 17, 2015) (holding that a former partner of a police officer was an "employer" within the meaning of the Whistleblower Law (citing *Rankin*)). The defendants have consequently failed to carry their summary judgment burden on this issue.

Second, the defendants contend that "Plouffe's complaint is not within the definition of 'wrongdoing' under the Pennsylvania Whistleblower Act." *See* Mot. for Summ. J. at 20. Under either version of the statute, "wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the

---

[10] The defendants lead off their argument with a citation to "43 P.S. § 1423(a)." *See* Mot. for Summ. J. at 18-19. By omitting the concluding phrase "by a public body or an instance of waste by any other employer as defined in this act," they evidence an intent to rely on the prior version of the statute. *See* 43 Pa. Stat. Ann. § 1423(a) (current version).

public or the employer." 43 Pa. Stat. Ann. § 1422. At the outset, the defendants offer no legal authority to support their position. A cursory review of caselaw, though, reveals that a code of ethics for school officials may be able to serve as the predicate for satisfying the "wrongdoing" standard. *See Bielewicz v. Penn-Trafford Sch. Dist.*, No. CIV.A. 10-1176, 2011 WL 1486017, at *5 (W.D. Pa. Feb. 9, 2011) (noting that the allegations suggested that the defendants' "actions were violative of a code of conduct or ethics for school officials and, thus, constitute a wrongdoing under the statute" (internal quotation marks omitted)). Plouffe's Statement of Undisputed Facts indicates that he informed Kutztown University that the hiring of Pittaro would violate both criminal law and ethical codes. Given the plain language of the statute, the court is disinclined to validate the defendants' argument without citation to at least some legal authority (preferably, given the argument's tendency to cut against plain statutory text, a citation to some authority of a state origin). Again, the defendants have failed to carry their summary judgment burden on this issue.

Finally, the defendants maintain that Plouffe cannot satisfy the governing causation standard. *See* Mot. for Summ. J. at 20-21. To establish a violation of the Whistleblower Law, an employee must "come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *Anderson v. Board of Sch. Directors of Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173 (3d Cir. 2014) (internal quotation marks, citation, and footnote omitted). "If the employee makes this showing, the burden shifts to the employer to establish that there was a legitimate reason for the adverse action. . . . Once the employer offers such evidence, the burden shifts back to the employee to show that this reason was merely pretextual." *Id.* at 173 n.4 (citations omitted). In this case, the record permits the issue of

causation to be decided by a jury. With that said, it follows that the defendants have, once more, not discharged their summary judgment burden.

Given this state of affairs, the court is compelled to allow the whistleblower claim to proceed to a jury. At this stage, and viewing the summary judgment record against the backdrop of the pleadings, it appears that this claim moves forward against all of the individual defendants, except for John Cavanaugh ("Cavanaugh") and Michael Mottola ("Mottola").[11] If at all possible, it would be beneficial if the parties could come to an agreement as to who the proper defendants are with respect to this claim.[12] But for now, it is enough to state that the court must deny the defendants' motion as it relates to the claim under the Whistleblower Law.

On a final note, Plouffe asserts an independent violation of the provision of the Whistleblower Law that states that "[a]n employer shall post notices and use other appropriate means to notify employees and keep them informed of protections and obligations under this act." 43 Pa. Stat. Ann. § 1428; *see* Fifth Am. Compl. at Count Five. Although the defendants ask the court to enter judgment in their favor on this claim as well, they advance absolutely no argument in support of their request. Indeed, they do not even mention section 1428 in their brief. The court is therefore constrained to allow this claim to proceed alongside the retaliation claim.

### 4. The Pennsylvania Administrative Agency Law Claim

The precise nature of this claim is wholly unclear. Nevertheless, Plouffe grounds this claim in the due process provisions of the federal and state Constitutions. *See* Resp. at 37-38.

---

[11] Judge McLaughlin previously dismissed Kutztown University as a defendant on sovereign immunity grounds. *See* Order, Doc. No. 57. It also appears that she dismissed Robert Watrous as a defendant on June 1, 2012. *See* Order, Doc. No. 181.

[12] Because it does not appear that Cavanaugh and Mottola are proper defendants with respect to the other claims that will be allowed to proceed, the parties should seriously consider making it clear (by stipulation or otherwise) that, given the court's rulings in this opinion, these two defendants are dismissed from the entirety of the case.

The court has already ruled that he cannot make out a due process claim under the federal Constitution. With respect to the state Constitution, "courts within the Third Circuit have consistently . . . found that the Pennsylvania Constitution does not confer a private right of action on an individual who seeks to recover damages from a defendant." *Hadesty v. Rush Twp. Police Dep't*, No. CV 3:14-2319, 2016 WL 1039063, at *15 (M.D. Pa. Mar. 15, 2016) (internal quotation marks and citations omitted). And assuming that Plouffe is seeking equitable relief for a violation of the Administrative Agency Law, it does not appear that that statute authorizes the type of equitable relief sought in this matter. *See* 2 Pa. C.S.A. § 702. For these reasons, the court grants the defendants' motion with respect to this rather unique claim and enters judgment in their favor.

### 5. The Section 1983 Conspiracy Claim

Because the court enters judgment in favor of the defendants on Plouffe's constitutional claims, the court likewise grants the defendants' motion with respect to the conspiracy claim and enters judgment in their favor. *See Hamborsky v. O'Barto*, 613 F. App'x 178, 182 (3d Cir. 2015) (stating that "[g]iven our conclusion that the malicious prosecution claims fail, [the plaintiff's] conspiracy claim must also fail because there is no underlying violation of his constitutional rights, which is a prerequisite for conspiracy liability" (citation omitted)).

### 6. The *Weingarten* Claim

For the reasons set forth by Judge McLaughlin in dismissing a similar claim in the companion case, the court grants the defendants' motion with respect to the *Weingarten* claim and enters judgment in their favor. *See Plouffe v. Gambone*, No. CIV.A. 11-6390, 2012 WL 2343381, at *6-7 (E.D. Pa. June 20, 2012) (McLaughlin, J.). The law-of-the-case doctrine, even assuming it can be applied, is not nearly as rigid as Plouffe suggests. *See* Resp. at 40.

### 7. The Gender Discrimination Claims

As to the final claims, the defendants move for summary judgment on Plouffe's gender discrimination claims under Title VII and Title IX. *See* Mot. for Summ. J. at 23-27. The parties agree that the relevant inquiry is guided by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.*; *see also* Resp. at 42-49. The sole disagreement revolves around whether the factual record is of a state such that Plouffe is entitled to a jury resolution of these claims. Although these claims surely admit of weaknesses, the record does indeed require a jury to determine where those weaknesses might lead. As a result, the court must deny the defendants' motion with respect to the gender discrimination claims. These claims, brought solely against Kutztown University, will proceed along with the claims under the Whistleblower Law.

## IV.    CONCLUSION

Although the defendants are unable to prevent Plouffe from reaching a jury, they have succeeded in funneling this case into the rather straightforward employment case that it is. As such, the jury will therefore pass on federal statutory claims, namely the gender discrimination claims under Title VII and Title IX, and state statutory claims, namely the claims under the Whistleblower Law. At long last, a final resolution is on the horizon.

The court will issue a separate order formally disposing of the outstanding motions.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.